UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 05-74493 |
| | : | |
| BRADLEY T. SMITH | : | Chapter 13 |
| | : | |
| Debtor(s) | : | Judge:  John E. Hoffman Jr. |

**CREDITOR SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN RESPONSE
TO DEBTOR'S POST ORAL-ARGUMENT BRIEF CONCERNING THE SEC'S
<u>MOTION TO DISMISS OR CONVERT DEBTOR'S BANKRUPTCY PETITION</u>**

## Table of Contents

I.     The SEC's Claims Are Noncontingent and Liquidated
       Under the McGovern Analysis……………………………………………………………2

       A.     Eligibility Determinations Must Not Be Limited to Reference
              to the Debtor's Schedules……………………………………………………………3

       B.     Under *McGovern*, the SEC's Disgorgement Claim Against Debtor was
              Liquidated and Noncontingent……………………………………………………………4

II.    Hypothetical Discretion Aside, Courts In This Circuit and Elsewhere Do Not
       Actually Deviate From the Practice of Imposing Disgorgement in
       SEC Offering Fraud Cases Equal to the Amount of Ill-Gotten Gains
       Obtained From The Fraud………………………………………………………………..11

III.   Debtor's Post-Argument Brief Is Unavailing……………………………………………...13

       1.     Debtor's Argument That A Claim Needs to Be Reduced to a
              Judgment In Order to Be Unliquidated Is Contradicted by the Case Law……….13

       2.     Debtor's "Duty to Pay" Argument is Irrelevant and Redundant and his
              "Substantial" Dispute Argument Overstated……………………………………17

       3.     Debtor's Control Person Arguments Are Without Merit………………………..18

       4.     Debtor's Reliance on the Case Law Is Misplaced………………………………22

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 05-74493 |
| | : | |
| BRADLEY T. SMITH | : | Chapter 13 |
| | : | |
| Debtor(s) | : | Judge:  John E. Hoffman Jr. |

**CREDITOR SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN RESPONSE TO DEBTOR'S POST ORAL-ARGUMENT BRIEF CONCERNING THE SEC'S MOTION TO DISMISS OR CONVERT DEBTOR'S BANKRUPTCY PETITION**

The SEC respectfully submits this response to Debtor's brief in support of oral argument (docket no. 49) and in further support of the SEC's motion to dismiss or convert Debtor's Chapter 13 case (docket no. 23).  At the oral argument, held on May 16, 2006, Debtor requested the opportunity to submit a supplemental post-hearing brief.  The SEC did not oppose that request.  The Court granted Debtor' request, and permitted the SEC this opportunity to respond.  At the close of the hearing, the Court informed the parties of two subjects it specifically wanted addressed in the post-hearing submissions.  First, the Court asked the parties to apply the court's analysis in the *In re McGovern* decision to the facts in this case.  Second, the Court asked the parties to discuss the range of discretion actually applied by courts in determining disgorgement amounts in similar SEC cases.

Remarkably, Debtor did not even cite to *McGovern* in his latest brief, much less apply it.  As we demonstrate below, under the *McGovern* analysis, the SEC's disgorgement claim of $2,095,517 was both noncontingent and liquidated as of the Petition Date.  As to the discussion of actual discretion used in similar cases, Debtor relies on snippets of generalized dicta in a handful of SEC disgorgement decisions, rather than address the level of discretion actually

employed by courts and factors that they actually consider in determining what disgorgement, if any, to impose in SEC offering fraud cases.   As discussed herein, a review of the case law reveals that, in reality, courts use very little discretion in awarding disgorgement in offering fraud cases, almost invariably using the total ill-gotten amounts received by defendants though the fraudulent offering as the basis for disgorgement.  As a practical matter, courts uniformly impose disgorgement in an amount equal to the defendants' ill-gotten gains from the fraud, without regard to any other criteria, including whether the money has subsequently been dissipated.

Rather than submit a brief that comports with the Court's instructions, Debtor has submitted a rambling 29-page opus that attempts to raise new arguments, introduce new evidence and invent new legal standards.  None of this alters the fact that as of the petition date, the SEC's $2 million unsecured claim was noncontingent, liquidated, and exceeded the $307,675 limitation on such debts imposed by Section 109(e) of the Bankruptcy Code.

In this submission, we will first focus our attention on *McGovern* and relevant precedent, as requested by the Court, and then respond briefly to Debtor's submission.

## ARGUMENT

### III.    The SEC's Claims Are Noncontingent and Liquidated Under the McGovern Analysis.

At the conclusion of the oral argument, the Court asked the parties to apply the analysis used in *In re McGovern*, 122 B.R. 712 (N.D. Ind. 1990), to this case.  In *McGovern*, the creditor, a nonprofit organization, claimed that the debtor had misappropriated funds in the amount of $150,655 for his own personal benefit while employed as the nonprofit's executive director. The debtor vigorously disputed the claim, denied any wrongdoing, and disputed all of the operative facts concerning liability on the claim.  The nonprofit's claim was the subject of litigation in the

2

state courts prior to the petition for relief under Chapter 13.  That litigation was stayed by the

petition and the claim had not been reduced to judgment.   As of the date of the petition at issue

in *McGovern*, the ceiling for noncontingent, liquidated unsecured debts under Chapter 13 was

$100,000.

On these facts, the *McGovern* court held that the nonprofit's claim was noncontingent

and liquidated, and thus rendered the debtor ineligible for bankruptcy protection under Chapter

13.  The court so held even though the debtor disputed the claim, and even though the claim

sounded in tort and had not yet been adjudicated.  The *McGovern* court's reasoning applies with

even greater force to the instant case.  Here, by contrast, Smith's liability had already been

established prior to the petition date, and the disgorgement amount was not seriously in dispute.

We discuss the decision and its application to Smith in greater detail below.

**A.**    **Eligibility Determinations Must Not Be Limited to Reference to the Debtor's Schedules.**

The *McGovern* court first determined that "a debtor's eligibility for relief under Chapter

13 is not determined solely by reference to the debts and claims as he has chosen to schedule

them."  *McGovern,* 122 B.R. at 714.  The court noted: "Congress did not intend that debtors

would be given exclusive control over the accessibility to Chapter 13 or be permitted to

circumvent its debt ceilings by the artful manipulation of the information contained in the

bankruptcy filings."  *Id.*  The court added that "[e]ven where the Chapter 13 statement is filed in

good faith, it is not dispositive on the question of eligibility.  Rather, it is only the point of

beginning."  *Id.*  (citations omitted)

While a showing of bad faith is not required in order for the Court to look beyond a

debtor's bankruptcy schedules, the evidence in this case suggests that Smith did in fact act in bad

faith in omitting to identify the SEC's claim amount.  In this case, and as noted in the SEC's

3

prior submissions, despite being informed on numerous occasions prior to the petition date (e.g.,

in the summary judgment motion and in the proposed final pretrial order) as to the specific

amount of the SEC's claim for disgorgement against Smith, Debtor willfully chose not to include

this number in his bankruptcy schedule F filed on October 28, 2005.  (Docket No. 7)[1]

Instead of including this readily known claim amount, Smith simply left the amount of

the SEC's claim blank.  Moreover, while Smith checked the boxes indicating "contingent" and

"unliquidated" next to the SEC's claim, he chose not to check the box for "disputed."  This

decision not to check the "disputed" box is consistent with the Final Pretrial Order, serving as

additional evidence that Debtor did not seriously dispute the amount of the SEC's disgorgement

claim, as further evidenced by his stipulation only a few weeks after the petition date to the exact

amount claimed by the SEC.  It was only after the SEC moved to dismiss Debtor's bankruptcy

petition that Debtor took the position that the disgorgement amount claimed by the SEC was

genuinely in dispute.

### B.   Under *McGovern*, the SEC's Disgorgement Claim Against Debtor was Liquidated and Noncontingent.

After observing that a debtor's schedules were only the starting point for determining a

Debtor's eligibility for relief under Chapter 13, the court in *McGovern* next addressed the

concept of liquidated versus unliquidated claims, the gravaman of the dispute in the instant case.

The court offered the following analysis of this issue:

> Liquidation relates only to the amount of any liability.  It does not
> concern the existence of the liability itself.  It focuses upon the certainty
> of the amount claimed due or the precision with which it can be
> determined.  Whether a debt is liquidated turns on whether it is subject to
> ready determination and precision in computation of the amount due.
> Since the question of liquidation is separate from the question of liability,

---

[1]  By the petition date, the SEC had also set forth its specific claim for civil penalty amount against Smith, stating in the proposed Final Pretrial Order that it was seeking a $120,000 civil penalty against Smith.  (Docket No. 24, Ex. F)  Smith also failed to include this amount in his schedule.

even if the liability is conceded or established, so long as the amount of liability cannot be readily determined the debt is unliquidated.

A claim is often characterized as liquidated if the amount due can be readily ascertained either by reference to an agreement or though simple mathematics. If the amount of the claim can be ascertained, or is capable of ascertainment by mere calculation or computation, it is liquidated; if judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated.

*McGovern,* 122 B.R. at 715 (internal citations omitted).

The court in *McGovern* also set forth its understanding of the concept of contingent

versus noncontingent claims:

The proper characterization of a claim as contingent or noncontingent depends upon events that have already taken place, as opposed to events which have yet to occur. So long as all of the allegations upon which the fact of liability is based relate to events that have already occurred the claim is noncontingent. We are not concerned with the uncertainty that exists over whether or not the finder of fact will ultimately determine that those events actually occurred and impose liability. Otherwise, every claim, whether in contract or tort, would be contingent until judgment has been entered.

*Id.* at 716.

The *McGovern* court clarified that "a disputed debt is not the same as a contingent or

unliquidated one. Merely because a debtor disputes a debt, or had defenses or counterclaims,

that does not render that debt contingent or unliquidated." *Id.* at 716-17. The court added:

"Disputes concerning a claim do not change the characterization it would otherwise have as

noncontingent or liquidated. . . . Quite simply, disputes, defenses, and counterclaims concerning

a debt are not relevant to the question of eligibility for Relief under Chapter 13." *Id.* at 717.

Applying these standards, the court in *McGovern* found that the claims at issue in that

case were both noncontingent and liquidated. The court found the claim noncontingent because

"[a]ll of the events upon which the claim is premised occurred prior to the date of the petition.

Although debtor's liability as a result of those determinations had not been determined, all of the

events needed to establish or give rise to that liability had already occurred." *Id.* at 717. This

reasoning applies equally to the instant case, as the SEC's claims were based on conduct that

occurred prior to the petition date.

The *McGovern* court found the claim to be liquidated because determination of the

amount of the liability flowing from the misappropriation of funds, even though disputed by the

debtor, required "only simple arithmetic. After determining debtor's liability for a multitude of

separate events, we need only add up the amount of money involved in each to determine the

amount of the claim. This will require only mathematics and not the exercise of judgment. As a

result the claim is a liquidated one." *McGovern*, 122 B.R. at 717.

After determining that the nonprofit's claim was noncontingent and liquidated and

rendered debtor ineligible for relief under Chapter 13, the court next considered and rejected the

debtor's motion to alter or amend the ruling. In the process, the *McGovern* court provided

additional analysis on the concept of liquidated versus unliquidated claims. This analysis has

direct application to the instant case. The debtor in *McGovern* had filed the motion to amend

because it wanted to make certain that the bankruptcy court understood that the debtor

vigorously disputed not only liability, but also the "amount of any obligation and the accuracy of

the amounts claimed due." *Id.* at 718. In denying the motion to amend, the *McGovern* court

made clear that it was fully aware that the debtor disputed not only his liability to the nonprofit,

but the amounts claimed, and that the issue of the amount of liability had not yet been

adjudicated by any court. The court made the salient observation that:

> [g]iven the preliminary nature of the court's inquiries for the purpose of
> determining Chapter 13 eligibility, the court's decision cannot and should not
> be interpreted as a determination that the amounts claimed due the movants are
> in fact correct or accurate. Instead, it means only that the evidence furnishes

data which, if believed, makes it possible to compute the amount with
exactness, without reliance upon opinion or discretion.  That the debtor may
wish to challenge or controvert this evidence does not change the fact that it
exists and is, potentially capable of being believed.  Our decision does not
preclude the debt from having the opportunity to do so.  It means only that this
opportunity must be exercised in a different forum or under the auspices of a
different Chapter of the Bankruptcy Code."

*Id.* (internal citations omitted).

In the instant case, the SEC has satisfied its obligation to demonstrate the
possibility of computing the amount of Smith's joint and several disgorgement obligation
with exactness, without reliance upon opinion or discretion.   Indeed, in the district
court's summary judgment ruling entered prior to the petition date, the court determined
the specific amounts raised in the two fraudulent offerings at issue -- $1,272,665 from 49
investors in the Continental offering and $822,852 from 29 investors in the Scioto
offering.  The sum of these offerings, $2,095,517, is the disgorgement amount claimed by
the SEC.   (Docket No. 24, Ex. E)

As the *McGovern* decision makes clear, the mere fact that a debtor disputes a
claim does not render the claim unliquidated.  The proposition applies with even greater
force in the instant case given the relative absence of any genuine dispute over the
disgorgement amount at the time of the petition date as compared to the debtor in
*McGovern.*

Significantly, in the proposed Final Pretrial Order filed jointly by the parties on
September 30, 2005, for the Court's approval and signature, the SEC set forth the legal
standard for determining the amount of disgorgement to be imposed against Smith and
the entities through which he fraudulently raised the $2,095,517 from the two offerings.
(Docket No. 24, Ex. F, pp. 10-11).  At the time of the submission of the proposed Final

Pretrial Order, Debtor did not challenge this legal standard. *Id.* Subsequently, the district adopted this legal standard in the Final Pretrial Order it entered on December 2, 2005, setting forth that: (1) disgorgement is an appropriate remedy in SEC enforcement actions; (2) the Sixth Circuit has required defendants to disgorge "a sum of money equal to all the illegal payments he received;" (3) "disgorgement need only be a reasonable approximation of profits causally connected to the violation;" (4) a defendant's current net worth "is irrelevant to the Court's consideration of the disgorgement award; and, most significantly, (5) "Courts typically order issuer defendants such as Continental and Scioto to disgorge the full amount o the proceeds of an offering in SEC actions, such as this one, based on fraudulent offerings. *SEC v. Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998) (ordering disgorgement of offering proceeds even where principals did not personally benefit); *SEC v. Manor Nursing Centers, Inc.*, 458 F.3d 1082, 1102 (2d Cir. 1972) (ordering disgorgement of proceeds in stock offering fraud case)." (Docket No. 43, pp. 9-11).

The legal standard set forth in the Final Pretrial Order governing determination of disgorgement amounts, coupled with the adjudicated and stipulated facts existing at that time, left little dispute as to what amount of disgorgement would be entered by the district court, regardless of whether Debtor was willing to stipulate to entry of a final judgment as of the petition date, rather than a few weeks thereafter.

The Final Pretrial Order also set forth the appropriate legal standard relating to Smith's liability as a control person of Continental and Scioto, pursuant to Section 20(a) of the Securities Exchange Act. In addition to seeking disgorgement against Smith in his personal capacity, the SEC was also seeking to have Smith held jointly and severally liable for any disgorgement

amounts owed by Continental and Scioto, under Section 20(a).  As the SEC previously noted, the district court had found Smith liable as a control person in its summary judgment ruling.  As was set forth in the Final Pretrial Order, Section 15 U.S.C. §20(a) provides that control persons "shall also be liable jointly and severally with and to the same extent as such controlled person." (Docket No. 43, p. 11).  Again, Debtor did not challenge the legal standard for control person liability, nor could he, since the statute plainly provides that joint and several liability is mandatory against adjudicated control persons such as Smith.

Although Debtor suggests that the discretionary nature of a disgorgement determination renders such claims unliquidated until entry of judgment, he has not suggested at any point in this proceeding or to the district court in the underlying SEC enforcement action any factor or criteria actually considered by any federal court that would serve to reduce the level of disgorgement from the amount sought by the SEC based on the factual record in the case at that time.  Nor has Debtor put forward any case in which a district court has imposed disgorgement in an offering fraud in an amount less than the amount of proceeds in the offering.   At best, Debtor supplied to the district court -- in connection with the contemplated remedies hearing that never took place due to Debtor's subsequent capitulation to the SEC's disgorgement demand -- affidavits from a handful of investors indicating that they did not believe that they were defrauded.[2]  (Docket No. 50).

---

[2]  Obviously, in view of the fact that Debtor, subsequent to the petition date,  stipulated to the disgorgement amount sought by the SEC ($2,095,517) and a final judgment was actually entered by the Court for such amount, the SEC opposes the view that disgorgement is not appropriate with respect to the investors whose affidavits Debtor has files with this Court.  Nonetheless, the SEC believes it a useful exercise to assume Debtor's best case, which, even though counterfactual, do not establish that the SEC's claims, at the time of the petition date, were contingent or unliquidated.

Even if the district court were to deny disgorgement as to these investors,[3] and to reduce the disgorgement amount accordingly, determining the precise disgorgement amount would still require only the ministerial calculation of deducting the amounts invested from the investors from the total amounts raised in the offering.  Under *McGovern*, such calculations and adjustments do not render a claim unliquidated.  Moreover, in the highly unlikely event that the district court deducted **_all_** of the affiants' investments in its calculation of disgorgement, the remaining disgorgement figure would still vastly exceed the $307,675 ceiling for unsecured, noncontingent, liquidated debts under Chapter 13. Given that Debtor already listed $258,184.13 of such debt in its original schedules, even if the district court were to have held that merely $50,000 of the $2 million raised through fraud was subject to disgorgement, such a paltry amount would still have put Debtor over the limit for unsecured, noncontingent, liquidated debts. All of these hypothetical scenarios are, of course, entirely counterfactual, as judgments were in fact entered for the entire $2 million, with Debtor's consent, only a few weeks after he filed his schedules in which he omitted to even list the dollar amount of the SEC's claim.

Thus, against this backdrop -- where the amount of proceeds of the fraudulent offering already having been adjudicated down to the penny (which amount Debtor never challenged at any point in the district court proceedings) prior to the petition date, an unchallenged legal standard that provides that disgorgement of such proceeds is not only permitted but typically granted against the person(s) or entity(ies) who receive the funds, and an undisputed legal standard requiring the district court to hold Smith jointly and severally liable as a control person – the SEC has plainly met the *McGovern* standard for "liquidated" debts.

---

[3]   This hypothetical is also counterfactual and highly improbable, given that the court, in its summary judgment ruling, found fraud on the basis of misrepresentations contained in the offering memoranda, as a legal matter found that the SEC did not need to establish reliance and also that the "in connection with" requirement for SEC fraud claims was satisfied even if some or all investors did not receive the offering memoranda until after their investment decision was made.  (Docket No. 24, Ex. E, pp. 10-11)

**IV.**     **Hypothetical Discretion Aside, Courts In This Circuit and Elsewhere Do Not Actually Deviate From the Practice of Imposing Disgorgement in SEC Offering Fraud Cases Equal to the Amount of Ill-Gotten Gains Obtained From The Fraud.**

In addition to asking the parties to apply the court's analysis in *McGovern* to the instant case, the Court also asked the parties to discuss the range of discretion actually applied by courts in this circuit in cases similar to this one.  A review of the relevant case law in this circuit and elsewhere reveals a well-settled practice of imposing disgorgement on the offering entity in an amount equal to all of the illegal payments received.  *See, e.g., SEC v. Washington County Utility Dist.,* 676 F.2d 218, 227 (6th Cir.) (reversing district court decision and requiring defendant in offering fraud to disgorge a sum equal to all of the illegal payments he received); *SEC v. Blavin,* 760 F.2d 706, 711  (6th Cir. 1985) (affirming district court order requiring disgorgement of individual defendant's "profits gained through securities law violations"); *SEC v. Johnston,* 143 F.3d 260, 262 (6th Cir. 1998) (noting lower court's order of disgorgement of individual defendant's commissions from fraudulent offerings, vacating district court subsequent decision to waive disgorgement amount based on inability to pay).

Notably, all three of these cases involved individual defendants, as opposed to the entities through whom the offerings were conducted.  In entering disgorgement orders against these defendants, the court in each instance ordered disgorgement of the entire amount of ill-gotten gain received by the defendant.  In this case, not only is Smith liable individually for his personal, ill-gotten gains, but he was also found liable, as a control person under Section 20(a) of the Securities Exchange Act, for the ill-gotten gains of the entities through whom he conducted the offerings:  Continental and Scioto.

A review of the case law reveals that courts uniformly require the offering entities to disgorge the entire amount of offerings obtained through fraud.  *See, e.g. SEC v. Marker,* 427 F.

11

Supp. 2d 583 (N.D.N.C. (ordering entity defendant to disgorge entire amount raised from

offering); *SEC v. Manor Nursing Ctrs, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ("We hold that it was

appropriate for the district court to order [defendants to disgorge the proceeds received in

connection with the [securities] offering"); *SEC v. Interlink Data Network of Los Angeles, Inc.*,

1993 U.D. Sit. LEXIS 20163 at *53-54 (C.D. Cal. Nov. 15, 1993) (ordering disgorgement of

gross amount received from fraudulent securities offering). *See also SEC v. Pacific Bancorp*,

142 F.3d 1186 (9th Cir. 1998) (ordering disgorgement of offering proceeds even where principals

did not personally benefit).

Notably absent from the disgorgement analyses undertaken by federal courts is any sense

of discretion or deviation from the basic concept that defendants who are found liable for fraud

must disgorge all that they received from the fraud, even if they no longer possess the assets.  In

case after case, courts have made clear that: (1) current financial condition is not a relevant

consideration; and (2) where disgorgement calculations are inexact, any risk of uncertainty

should fall on the wrongdoer whose illegal act created that uncertainty. *See*, *e.g. SEC v.

Robinson*, 2002 WL 1552049 (S.D.N.Y. July 16, 2002).  *SEC v. Robinson* is particularly

instructive in demonstrating the nature of the type of discretion courts actually employ in

determining disgorgement amounts in SEC enforcement actions.  In *Robinson*, the discretion

exercised by the Court was limited to requiring the SEC to show some evidence that the public

actually invested the amount that the SEC claimed was invested in the fraudulent offering.  The

SEC sought disgorgement of $438,844.14, but offered no proof as to this amount.  Robinson had

conceded at a preliminary injunction hearing that he received $420,000 or slightly more from

investors in the fraudulent offering.  The court rejected the SEC's unsubstantiated number and

instead accepted the amount stipulated to by the defendant.  This is the type of discretion actually

12

employed by courts, hardly sufficient to render a claim unliquidated under the McGovern analysis.

In sum, despite whatever generalized notions of discretion may theoretically exist in determining disgorgement amounts in the offering fraud context, the actual discretion exercised by federal courts in reality is quite limited, typically involving resolution of only the following question: (1) how much money did the defendant receive through its fraudulent offering?   In the instant case, as of the petition date, there was no dispute and the district court had already determined that Continental and Scioto received $2,095,107 in investor funds from the two fraudulent offerings.  Further, as of the petition date, Smith's liability as a control person was also already established, which, under the plain language of the Section 21(a) of the Exchange Act, rendered him jointly and severally liable with Continental and Scioto for the full extent of their disgorgement obligation.  Accordingly, as of the petition date, regardless of whether Smith "disputed" the amount of disgorgement he owed, the actual discretion of the district court in its application of the legal standard and factors for determining the appropriate disgorgement amount was quite limited.

Again, at most, Smith could have raised some arguments at the margin that particular investors admit they were not defrauded.  But, as noted by the court in *McGovern*, a district court's determination that particular transactions (or investments) should or should not be included in the calculation of disgorgement (or, in the case of *McGovern,* misappropriation) does not rise to the level of judgment calls that would make a debt unliquidated.

All of this discussion about possible lower disgorgement amounts is academic, of course, as Debtor did consent to the $2,095,517 disgorgement order sought by the SEC, and the district court did enter judgment against Debtor imposing disgorgement in this amount.

**III.    Debtor's Post-Argument Brief Is Unavailing.**

The remainder of this brief is devoted to responding to the various arguments raised by

the Debtor in his post-hearing brief.  We respond using the same numbered order as Debtor

raised them in his brief.

**2.    Debtor's Argument That A Claim Needs to Be Reduced to A Judgment In Order to Be Unliquidated Is Contradicted by the Case Law.**

In his first numbered argument, Debtor cites *In re Carpenter*, 79 B.R. 316, 318 for the

proposition that the "starting point to any 109(e) determination should be to isolate that specific

point in time when it is certain that a debtor actually owes or has a duty to pay a specific amount

on a specific date."  (Debtor's Brief at 5).  The SEC is confused by this reference, since *In re*

*Carpenter* was a Chapter 12 case, not involving 109(e).  Moreover, the bankruptcy court actually

held that the debtor's unsecured, contingent, liquidated debt exceeded the threshold for eligibility

for relief as a family farmer under Chapter 12 of the bankruptcy code.  *Id.* at 321.  To the extent

that Debtor is suggesting that *Carpenter* stands for the proposition that the Sixth Circuit requires

a judgment in order for a claim to be contingent and liquidated, such a proposition is

contradicted by *In re Pearson*, 773 F.2d 751 (6th Cir. 1985), a case which has been addressed at

length previously and requires no further recitation here.

In this section, Debtor also touches on the breadth of discretion employed by district

courts in fashioning a disgorgement remedy.   The two cases cited by Debtor, however, do not

support the proposition that district courts actually exercise broad discretion in SEC offering

fraud cases.  Debtor first cites *SEC v. Namer*, 2006 WL 1541378 (2d Cir. 2006).  This case

actually supports the SEC's position, as the Second Circuit in *Namer* upheld the district court's

order requiring disgorgement of all profits obtained through the securities fraud.  The reference

to "broad discretion" was a show of deference to the district court's decision by the court of

appeals, and not in any way indicative of the amount of discretion that the district court actually employed in determining the amount of disgorgement.

Debtor next cites *SEC v. Great Lake Equities Co.*, 775 F. Supp. 211, 214 (D. Mich. 1991). This case also supports the SEC's position. In *Great Lakes*, the court ordered defendants to disgorge the entire amount of their ill-gotten gain, and specifically refused to reduce that amount by taking into account deductions for overhead, commissions or other expenses. *Id.* at 214. Noting that the Sixth Circuit had not yet directly considered the issue of deductions for overhead and expenses, the district court declared that "the manner in which defendants … choose to spend their misappropriate is irrelevant to their objection to disgorgement." *Id.* The *Great Lakes* court then borrowed from another court's salient observation in explaining its rationale for rejecting the debtors' request to have the disgorgement amount reduced for expenses and overhead they incurred:

> "[The defendant's] construction would permit the perpetrator of a successful scheme, who was just as successful at dissipating the ill-gotten gains, to avoid a disgorgement order because at the time of the order, [it] had retained none of the proceeds from the scheme. To state the proposition is to discount the efficacy of it." *SEC v. Jet Travel Services, Inc.*, (CCH) Fed.Sec.L. Rep. [1975-76 Transfer Binder], 95, 317 at 98,609 (M.D. Fla. Aug. 29, 1975).

*Great Lakes Equities*, 775 F.Supp. at 214.

As with other theoretical arguments raised in the context of the SEC's motion to dismiss this petition, Debtor did not raise the issue of deductions for expenses at any time in the district court proceeding, including the Final Pretrial Order. Even if such issue might exist in theory, it did not exist in the instant case. Moreover, even if such an issue was actually raised in the district court proceeding and the district court permitted inquiry into the issue of expenses, the parties had already stipulated to the accuracy of bank schedules of the accounts at issue in this

lawsuit, and resolution of this issue would have involved ministerial calculations, and not the

exercise of judgment.  (*See* proposed Final Pretrial Order, Docket No. 24, Ex. F, pp. 18-19).

Debtor next cites to a couple of cases for the proposition that "a decision to award the

SEC an equitable remedy that will exhaust a defendant's assets requires careful independent

consideration by the District Court."  (Debtor's Brief at 8).  Neither of the cases cited, however,

remotely supports this proposition.  The language lifted by Debtor from *SEC v. Prater*, 289

F.Supp.2d 39, 54 (D. Conn. 2003) about the need for "careful consideration by the court" was

expressed in the context of the "decision to continue a temporary asset freeze" during the

pendency of a lawsuit.  The *Prater* dicta had absolutely nothing whatsoever to do with the level

of discretion to be employed in fashioning a disgorgement remedy after a finding of liability has

already been made.  The internal reference in *Prater* to *SEC v. Manor Nursing Homes*, 458 at

1105 also refers to asset freezes, not disgorgement orders.

Debtor then tales a remarkable leap from this mischaracterization of *Prater* to pronounce:

"This is why the District Court's ability to exercise its broad discretion to determine whether the

SEC's requested equitable remedy is appropriate or will not further injure the interest of the

investors could not have been constricted by the Sixth Circuit's holdings in *Blavin*."  (Debtor Br.

at 8).  Debtor's suggestion that courts should and do consider "investor interest" in determining

the amount of disgorgement to impose is a flat-out misstatement of the relevant case law,

unsupported by *Prater* and directly contradicted by relevant authority.  Indeed, as the Sixth

Circuit stated in *SEC v. Blavin*, "The purpose of disgorgement is to force "a defendant to give up

the amount by which he was unjustly enriched rather than to compensate the victims of fraud."

*Blavin*, 760 F.2d at 714.   Debtor has not offered a single case in which a court has even

considered reducing a disgorgement award due to some perceived harm to investors that might flow from depriving a fraudulent offeror with the proceeds of his fraud.

On page 10 of his brief, in furtherance of this concocted "investor interest" analysis, Debtor invents a number of factors that the court should take into account in determining what amount of disgorgement, if any, would be appropriate to impose on Debtor.   All of these factors are irrelevant.  Debtor has not pointed to one court that has considered any one of these factors. Some of these factors are truly baffling.  Take, for example, factor number 5, in which Debtor stated that the court should take into account the fact that "the investors' equity interest in Continental and Scioto would be destroyed if the District Court awarded the SEC its entire requested disgorgement." (Debtor's Brief at 10).  What Debtor seems to ignore here is that the investors' equity interest was already destroyed by the fraud.  Neither company has any operations; both filed for bankruptcy.  Out of more than $2 million invested, less than $250,000 remains invested in bank stocks, and the only reason that this small sum still exists is that the SEC obtained an asset freeze prohibiting further dissipation of the investor proceeds.

If Debtor were truly interested in his investors, he would voluntarily dismiss his Chapter 13 petition, in which he proposes miniscule payments to investors over a period of years and then discharge of his $2 million liability, and instead refile under Chapter 7, under which he would have no right of discharge pursuant to Section 803 of the Sarbanes-Oxley Act of 2002, codified at 11 U.S.C. 523(a)(19).

**2.    Debtor's "Duty to Pay" Argument is Irrelevant and Redundant and his "Substantial" Dispute Argument Overstated.**

In this section, at pages 11 to 17, Debtor basically rehashes a couple of arguments raised previously in his brief.  First, Debtor again raises the fact that no "duty to pay" had arisen, even though the Section 109(e) eligibility analysis does not turn on that distinction.  Second, Debtor

once again refers to his concocted balancing test, arguing that courts, in determining the issue of

disgorgement in SEC cases, should be balancing the interest of the SEC against "the need to

protect the interests of the investors."  (Debtor's Br. at 12).  Third, Debtor again argues that there

remained a "substantial" dispute as to the disgorgement amount as of the petition date, relying

primarily on the fact that the Final Pretrial Order included as "contested issues of fact," the

generalized remedies claims of the SEC.  The SEC submits that the mere fact that Debtor did

not, in the proposed Final Pretrial Order, stipulate to the ultimate liability determinations to be

made by the District Court, does not mean that there existed a genuine and substantial issue of

fact or law.  This is particularly true where, as here, the relevant facts and law have already either

been adjudicated (e.g., fraud finding, amounts raised in offerings) or were not challenged by

Debtor (e.g., the legal standard for determining disgorgement and joint and several liability for

control persons) as of the petition date.  The lack of any genuine or substantial dispute is further

revealed by Debtor's consent to a final judgment which included the $2 million disgorgement

amount only a few weeks after filing his Chapter 13 petition.  Debtor should not be rewarded for

delaying the entry of an inevitable judgment to gain advantage in the bankruptcy court.

### 3.      Debtor's Control Person Arguments Are Without Merit.

In Section 3 of his brief, at pages 17 through 20, Debtor makes a number of arguments

concerning the SEC's control person claims in the hopes of generating the appearance of a

"substantial" dispute.  None of these are availing.  First, Debtor now, for the first time,

challenges the mandatory language of Section 20(a) of the Exchange Act that control persons

"shall" be held jointly and severally liable with the persons or entities they control.  At no point

in the district court proceeding did Debtor challenge this plain reading of the statute.  Debtor

offers no legal support whatsoever for his claim that a Court has discretion to deviate from

18

Congress's express intent to hold control persons jointly and severally liable with the entities they controlled. As of the petition date, the district court had already found Smith liable as a control person. (*See* Summary Judgment Ruling, Docket No. 24, Ex. E).

Ignoring all of the above, Debtor contends that because the SEC continued to argue in the alternative as to Smith's liability between his direct, primary liability and his liability as a control person, that somehow that resurrected some substantial dispute as to joint and several liability that would otherwise not have existed. Such a tail-wagging-the-dog argument is absurd. A substantial dispute does not materialize merely because a party, unable to obtain a stipulation, argues in the alternative. Moreover, the argument is based on an untrue premise. In the Final Pretrial Order, the SEC sets forth its position (as opposed to a statement of the issues to be determined by the court) on the subject of Smith's disgorgement obligation at page 11 of the FPTO: "The SEC seeks an order finding Smith jointly and severally liable as a control person for the entire amounts of disgorgements, plus prejudgment interest, awarded against Continental and Scioto." (Docket No. 43, p. 10). The SEC does not even suggest in its disgorgement section any need to resort to some alternative basis of disgorgement against Smith.[4]

---

[4] A brief note is in order concerning this theoretical possibility that Smith conceivably might not have been held jointly and severally liable for the disgorgement of Continental and Scioto, and that instead his liability would have been based solely on the ill-gotten gains that he personally received. This counterfactual scenario, even if possible, would still have yielded noncontingent and liquidated unsecured debts in excess of the $307,675 ceiling for Chapter 13 cases. As with a disgorgement calculation based on offering proceeds, a disgorgement calculation based instead on investor funds paid to Smith or for his direct benefit would have been a simple task. Indeed, in the proposed Final Pretrial Order filed prior to the petition date, Debtor stipulated in paragraphs 12 and 16, located at pages 16 and 17, that Plaintiff's Exhibit 14 "accurately summarizes the uses of funds raised from" the Continental and Scioto Offerings." That stipulated exhibit, which we have attached at the end of this brief as Exhibit A, includes the following uses, all of which, it is undisputed, redounded to Smith's personal benefit :

| | |
|---|---|
| **From the Continental Offering:** | |
| Payments to Smith's personal bank accounts | $157,054.96 |
| Mortgage Payments for Smith's personal residence | $   5,423.04 |
| Other payment for benefit of Smith | $   2,030.00 |
| Payments of Smith personal American Express charges | $ 28,366.06 |
| **From the Scioto Offering:** | |
| Payments to Smith's personal bank accounts | $ 76,909.28 |
| Payments of Smith personal American Express charges | $   9,182.80 |

Debtor then jumps from this twisted logic syllogism to rehash his view that there

remained a substantial dispute as to the disgorgement owed by Continental and Scioto as of the

petition date, and that therefore, a substantial dispute also must have remained with respect to

Smith's derivative liability as a control person. We have addressed at length the lack of any

substantial dispute as to Continental and Scioto's liability above, and will spare the Court yet

another recitation of it.

Debtor then reverts to his "investor interest" argument, which as noted above, is simply

not a factor in determining disgorgement amounts.   If it were, however, the SEC is confident

that any court having found a defendant liable for fraud would not choose to permit the

defendant to retain the proceeds of his fraud in the hopes that the defendant can somehow "make

it up" to investors. The Court can pick its metaphor here. Whether it is allowing the inmates to

run the asylum or having the fox guard the henhouse, Debtor's concocted "investor interest"

argument finds no basis in the case law and would not, in any event, remotely support the

outcome that Debtor suggests.

Debtor concedes that Continental and Scioto, after having raised $2 million from

investors, would need to be liquidated if found liable for disgorgement of these proceeds, and

that Debtor would remain "the only one liable for most of the SEC's $2,095,517.93 requested

disgorgement." (Debtor Br. 19-20). On these points, the SEC readily agrees. However, the SEC

strongly disagrees with Debtor's contention that this result would be inappropriate. Indeed, it is

well-established that a defendant's financial condition and ability to pay is not relevant to a

_____

Obviously, based on the parties' stipulations to these uses, even if the District Court chose to ignore the plain
language of Section 20(a) of the Exchange Act and instead limited disgorgement to amounts received directly by
Smith or used directly for his benefit, such amounts were readily ascertainable, undisputed, and, when added to the
$258,184.13 of unsecured, noncontingent, liquidated debts already listed by Smith on his bankruptcy schedule,
would have put Smith well over the $307,675 ceiling for such debts under Chapter 13.

disgorgement determination in an SEC enforcement proceeding. *SEC v. Thorn*, 2002 WL 31412439, at *3 (S.D. Ohio, Sept. 30, 2002).  Moreover, Section 803 of the Sarbanes-Oxley Act (11 U.S.C. 523(a)(19)), which renders judgments obtained in SEC enforcement actions nondischargeable in Chapter 7 proceedings, demonstrates a Congressional intent to prevent fraudulent actors from using the bankruptcy laws to shield them from liability.  That Smith would be left holding the bag in the event that Continental and Scioto dissolve would be an appropriate outcome, given that he created the companies, solely-controlled them at all relevant times, and used them to defraud investors.

Although not relevant to the determination of disgorgement amounts, the SEC also strongly disagrees and takes exception to Debtor's suggestion that the remedies the SEC sought (and that were ultimately agreed to by Debtor and ordered by the Court) were not done in the investor's interest.  The SEC has a responsibility both to current and future investors. Continental and Scioto were already insolvent with limited hard assets and investments totaling less than $250,000 as of the petition date.  The rest of the $2 million had been spent.  These were failed companies.  The harm has already been done to investors. What Debtor is suggesting is that the Court should roll the dice with two insolvent companies having already been found to have engaged in fraud and to have misspent most of the $2 million they took in from investors, with no operations and no reasonable prospects of paying back injured investors (other than raising money from new investors), and that the Court should permit them to keep the paltry $250,000 that remains of investor funds, rather than disgorging that money to investors now. The SEC submits that consideration of investor interest strongly militates in favor of disgorging to investors now, whatever limited investor funds remain, rather than engaging in some fantasy about what these fraudulent, failed companies might do for investors if given a second chance.

Moreover, if Smith truly cared about investors, why is he fighting so hard to stay in Chapter 13, where his disgorgement obligation would be forever discharged after a proposed payment plan that would provide investors with less than pennies on the dollar (Docket No. 34), and investors would not stand a chance of recovering any additional sums from him?  Again, all of this is academic, since investor harm, investor interest and ability to pay are all irrelevant to the disgorgement analysis.

### 4.      Debtor's Reliance on the Case Law Is Misplaced.

In the last section of his brief, Debtor addresses some of the case law previously cited by the SEC.  Because we have previously discussed these cases, we respond only briefly.  In subsection (a), at pages 21 to 23, Debtor continues to misapprehend the test for "noncontingent" debts and to misplace reliance on *In re Carpenter*.   We believe that *McGovern* correctly articulates the standard, as discussed above.

Debtor also continues to incorrectly assert that the SEC's claim must be reduced to a final judgment in order to be noncontingent.  In his brief, Debtor narrows its position on this subject, now attempting to distinguish disgorgement claims from "claims based on agreements or statutes that have specific monetary provision that automatically create a duty to pay a specific amount." (Debtor's Brief at 22).  Again, if Congress had wanted to require tort or disgorgement claims to be reduced to a final judgment in order to be deemed noncontingent, it could have said so.  Here too, *McGovern* is on point, as the court expressly rejected the notion that claims sounding in tort needed to be adjudicated to judgment in order to be deemed noncontingent, and found that a creditor's unadjudicated and vigorously disputed misappropriate claim was noncontingent.  122 B.R. at 716 ("Although unadjudicated tort claims are often called contingent, this is not truly the case").

*In re Hughes*, cited at length by Debtor, does not require a different result. In the first instance, that case involved a tort claim for which liability was not even determined, much less an amount of damages fixed.  In the instant case, liability for fraud was established prior the petition date, and the disgorgement amount readily ascertainable.  To the extent that Debtor is suggesting that *In re Hughes* stands for the proposition that no tort claim can even be deemed noncontingent until a final monetary judgment has been entered, the SEC respectfully submits that such an interpretation is incorrect.  Such a reading is certainly at odds with the *McGovern* decision.  It is also at odds with the Sixth Circuit's discussion in *Pearson,* in which the court made clear that fact that a claim is disputed does not render it noncontingent.  The court specifically noted that "Congress excluded only contingent and unliquidated debt from the computation, disputed unsecured debt was not excluded."  773 F.2d at 754. (citing other cases).  The SEC readily concedes that the monetary relief determination in tort claims, as a general matters, tends to be less readily ascertainable than in contract claims, thus making it more likely that such claims would be deemed to be unliquidated.  However, in the instant case, as is discussed herein, and as is true in most SEC enforcement cases, the disgorgement amount was in fact readily ascertainable.

In subsection (b), at pages 25 to 27, Debtor essentially restates his position that there remained a substantial dispute as to the amount of disgorgement to be imposed against Smith, thus rendering Debtor's claim unliquidated.  This restated argument requires no additional response.

Finally, in subsection (c), at pages 27 to 29, Debtor sets forth his rationale as to why his omission of the SEC's claim amount was in good faith.  We respectfully disagree, for the reasons set forth herein and in our prior submissions.

## Conclusion

WHEREFORE, for the reasons set forth herein and in the SEC's prior submission, the

SEC respectfully requests that the Court grant the SEC's motion to dismiss or convert Debtor's

Chapter 13 case.


Respectfully submitted,


For Creditor U.S. Securities and Exchange
Commission:


Dated:   July 21, 2006          /s/ Angela D. Dodd_____
                                Angela D. Dodd
                                IL Bar No. 6201068
                                Tel. No: 312-353-7400
                                dodda@sec.gov



                                /s/ Sonia A. Chae_____
                                Sonia A. Chae
                                IL Bar No. 6199271
                                Tel. No: 312-353-6269
                                chaes@sec.gov



                                /s/ Steven J. Levine
                                Steven J. Levine
                                IL Bar No: 6226921
                                Tel. No: 312-886-1774
                                levines@sec.gov


                                U.S. Securities and Exchange Commission
                                175 W. Jackson Blvd., Suite 900
                                Chicago IL 60604
                                Fax No. 312-353-7398

## <u>CERTIFICATE OF SERVICE</u>

I, Sonia A. Chae, do hereby certify that a copy of the foregoing **CREDITOR SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN RESPONSE TO DEBTOR'S POST ORAL-ARGRUMENT BRIEF CONCERNING THE SEC'S MOTION TO DISMISS OR CONVERT DEBTOR'S BANKRUPTCY PETITION** was served on the parties that receive electronic notification in these proceedings on this day of July 21, 2006.

/s/ Sonia A. Chae
Sonia A. Chae
for the Securities and Exchange Commission